BItUNOT, Justice.
 

 The defendant was indicted -for the crime of murder. He was tried for that crime, and -the jury returned a verdict of guilty as charged. A motion for a new trial was filed, heard, and overruled, and the defendant was sentenced to be hanged by the neck until he is dead, at such time as the Governor of the state of Louisiana shall designate in his warrant. Erom this verdict and sentence he appealed.
 

 When the case was reached on the assignment docket of this court, the defendant, through his counsel, filed a motion for continuance. The motion recites that this court is composed of a Chief Justice and six associate justices; that Justice John St. Paul had retired from the bench and the vacancy caused thereby had not been filled; that, for the reason stated, the court as presently composed is not a complete Supreme Court; and that appellant is entitled to have his appeal heard by a full court. The motion concludes with the prayer that the case be continued until such time as the court shall be composed of a Chief Justice and six associate justices. This motion was filed, submitted, and overruled. In support of this ruling, it is only necessary to cite section 4, art. 7, of the Constitution of 1921.
 

 There are fourteen bills of exception in the transcript.
 

 Bill No. 1.
 

 Before the accused was arraigned, his counsel pleaded the unconstitutionality of Act No. 136 of 1932. The motion alleges that the act deprives the accused of a trial toy jury, that it deprives him of his day in court, and that it does not repeal articles 268, 269, 270, 271, 272, and 273 of the Code of Criminal Procedure.
 

 After a hearing thereon, the court overruled the plea, and this bill was reserved to that ruling. The court has attached to the bill the following per curiam:
 

 “In my opinion, Act No. 136 of 1932 is constitutional. The fact that the accused is deprived of a hearing before a jury of his plea of present insanity does not render the act unconstitutional. The plea of present insanity does not affect the guilt or innocence
 
 *552
 
 of defendant, and may be tried by tbe trial judge alone. Tbe further fact that the act makes it necessary that the accused make a reasonable showing of insanity before the court might be compelled to grant such hearing does not make the act unconstitutional. ■Legal remedy.is within the province of the appellate court to order such a hearing, in the event a proper showing has been made by an accused. In the case at bar, accused did make a proper showing, and was granted a hearing upon his plea for same; hence he is without interest to attack the act on this ground. The act palpably on its face, as well as by 'its inconsistent provisions, repeals articles 268, 269, 270, 271, 272 and 273 of the Code of Criminal Procedure.”
 

 The articles which the court holds are repealed by Act No. 136 of 1932 provide as follows: Article 268: When a plea of insanity is filed, the judge must appoint a lunacy commission, composed of the coroner of the parish and the superintendents of the Jackson and Pineville Insane Hospitals, to inquire into the sanity of the accused. Article 269: Every plea of insanity must be tried by the judge or by a jury of five or twelve jurors, according as the crime charged' is triable. Article 270: For the commitment to the criminal ward of a hospital for the insane of an accused found to be presently insane until his reason is restored. Article 271: If the accused is found to have been insane at the time of the commission of the crime charged, he is to be committed to the criminal ward of a hospital for the insane until discharged therefrom pursuant to the provisions of article 272. Article 273 is a bar to any review of a ruling by the lower court on the trial of a plea of insanity. The title of Act No. 136 of 1932 is as follows:
 

 “To amend and re-enact Article 267, and to repeal Articles 268, 269, 270, 271, 272 and 273 of the Code of Criminal Procedure for the State of Louisiana, and to repeal all laws or parts of laws in conflict herewith.”
 

 Section 1 of the act amends article 267 of the Code of Criminal Procedure and provides for the procedure that was literally followed by ’the trial court in this case. Sections 2 and 3 of the act are as follows:
 

 “Section 2. That articles 268, 269, 270, 271, 272, and, 273 are hereby repealed.
 

 “Section 3. That all laws or parts of laws in conflict with the provisions of this Act be, and the same arej hereby repealed.”
 

 It is true that section 2 of the act enumerates articles 268, 269, 270, 271, 272, and 273, but does not describe them as articles of the Code of Criminal Procedure. Nevertheless, the title of the act does specifically describe them as such, and, as they are in direct conflict with the provisions of section 1 of the act, they are repealed by section 3, the general repealing clause of the act, even if we should hold that they are not specifically repealed by section 2 thereof. We are of the opinion that the trial judge correctly ruled that Act No. 136 of 1932 is not repugnant to any provision of the Constitution, and that the defendant in this case was accorded every right to which he was entitled under the provisions of the act.
 

 Bills 2, 3, and 4 are more or less interrelated, but we will consider them separately.
 

 
 *554
 
 Bill No. 2.
 

 This bill was reserved to the overruling of an objection by counsel for the defendant to a question propounded to Dr. E. McC. Connelly while testifying as an expert in mental diseases on the hearing of the defendant’s. plea of present insanity. The question, objection and ruling follow:
 

 “Q. Was a record usually kept of the evidence adduced or report actually made by the examining psychiatrists for the purpose of leaving a record as to the patient’s psychiatric condition?
 

 “By Mr. Dowling:
 

 “I object to the question on the ground that it is irrelevant and immaterial.
 

 “By the Court:
 

 “It is very relevant. You have introduced here a' report from a Board of the United States Army. You have a record attached to that as to what they base it on, and this evidence is admissible. I therefore overrule the objection.”
 

 When the bill was prepared and presented for signature, the judge added thereto the following per curiam:
 

 “On the hearing of defendant’s plea of present insanity, defendant contented himself, with the offer. of no evidence other than a photo-static copy of an army record showing the discharge of one Louis Kenneth Neu from the United States Army in 1926, on a ‘certificate of disability on account of psychosis, unclassified, recessional or lucid phase,’ and a copy certified under Act of Congress, of the proceedings and findings of a Commission of Lunacy in the State of Gporgia in 1927, pronouncing one Louis Kenneth Neu a lunatic and committing him to a state hospital for the insane for treatment. No effort was made by the defendant to identify himself as being the same Louis Kenneth Neu at the bar. The army record was silent upon the facts and circumstances upon which the army doctors concluded that one Louis Kenneth Neu was entitled to a discharge on a ‘certificate of disability on account of psychosis, unclassified, recessional or lucid phase.’ Dr. E. McC. Connelly, one of the expert psychiatrists, when on the stand testified that he had been assigned to the psychiatric division of the Medical Corps of' the United States Army during the World War. He further testified that he was a Government Psychiatrist after the war in the examination of ex-soldiers. When asked what means and methods were used by the United States Army in surveying alleged insane soldiers, he replied that the Army used very much the same means and methods employed' in civil life. He was next asked if a record was usually kept of the' evidence adduced and' reports actually made by the (army) psychiatrists for the purpose of leaving a record as to the. patient’s psychiatric condition. It was to this question that the defendant objected. * * * After I overruled the objection. the doctor testified that a record was always kept and that the symptoms were always written down for the diagnosis of mental eases. * * *
 

 “The defendant stated to Doctors Connelly and O’Hara that the reason given by the Army doctors for his discharge (psychosis) was not the real reason, but that this had been arranged for the purpose of avoiding a
 
 *556
 
 court martial of the defendant for an affair with an army officer’s wife. Defendant stood upon this army record as a part of his plea of present insanity to avoid trial for his crime. Palpably, this record was subject to attack by the state. The question and answer were both material and relevant.”
 

 Pursuant to the provisions of Act No. 136 of 1932, Drs. O’l-Iara and Connelly were appointed a lunacy commission to examine the defendant with regard to his mental condition. Their report to the court was in the following words:
 

 “We have the honor to report that, in accordance with your orders, we have examined the above named Louis Kenneth Neu, and have carefully investigated his mental condition. It is our opinion that at the present time Louis Kenneth Neu is not insane, and that he is able to understand the proceedings and assist in his defense.”
 

 In addition to the report, both doctors testified on the hearing of the plea of present insanity that the defendant was not then insane and had never been insane. Tr. pp. 15-36.
 

 Testifying as to the reason given by the defendant for his commitment to the Millegeville Hospital in Georgia in 1927, Dr. O’Hara says:
 

 “He told me that he had just gotten off a big drunk — him and his wife — that they got into a taxicab, and that the taxicab driver was afraid of him. He said he wanted the car, took a gun and made the driver get out, and took the car. He said he was drunk, but didn’t want to steal the car, and he said they sent him to the hospital because his folks had a little political jerk, and that was the easiest way out of the episode.” Tr. p. 35.
 

 In addition to Drs. O’Hara and Connelly, Mr. George Miller also testified for the state on the hearing of the plea of present insanity. Their testimony appears in the transcript on pages 3 to 41, both inclusive, and counsel for the defendant announced that they had no rebuttal testimony to offer; whereupon the court, in our opinion, correctly held that the defendant was sane, responsible for his acts, and able to intelligently assist his counsel in his defense.
 

 Bill No. 3.
 

 This bill was reserved to the overruling of defendant’s objection to a question propounded to Dr. E. McC. Connelly. The judge in his per curiam to the bill correctly says:
 

 “The question was not answered by the witness and the line of examination was not pursued. Therefore the accused could not have suffered any injury.”
 

 Bill No. 4.
 

 This bill was reserved to the overruling of the defendant’s plea of present insanity. The court’s per curiam to the bill disposes of it. It is as follows:
 

 “The evidence taken on the hearing of December 6th, 1933, will be found in the transcript. It is made part of this per curiam as though copied in full. It convinced me beyond a reasonable doubt, not only that the defendant was sane and responsible at the present time (December 5th, 1933) and should be placed upon his trial, but it also convinced me that the defendant had always been sane and never at any time insane. It convinced
 
 *558
 
 me beyond a reasonable doubt that he knew the difference between right and wrong; that he was capable of electing whether to do right or wrong, and that he was able to intelligently assist his counsel in his defense, and that he fully understood the nature and consequences of the proceedings against him.”
 

 We have carefully read the testimony taken on the hearing of the defendant’s plea of present insanity, and we find that the ruling thereon is correct. The four bills we have considered were reserved in proceedings had preliminary to the trial of the case on its merits.
 

 Bill No. 5.
 

 This bill was reserved to the overruling of the defendant’s objection to the state introducing in the evidence the written confession of the accused, made and signed by him on September 28, 1933. The state had laid the proper predicate for the admission of the confession, and proposed to read it to the jury. The accused made no effort to traverse the testimony offered by the state, but objected to the admission of the confession on the ground that Louis Kenneth Neu had been adjudicated a lunatic by the court of Chatham county, Ga., on February 9,1927, and that this judgment was in force and effect on the date the confession was made, and counsel introduced and filed, in connection with their objection, a certified copy of the judgment referred to. We quote from the court’s per curiam to this bill the following:
 

 “The defendant on traverse offered no evidence at all to controvert or deny the voluntary character of the confession. The defendant, however, did offer in evidence as ground for his' objection to the admissibility of the confession, an adjudication of lunacy of one Louis Kenneth Neu, on February 9th, 1927, by the Court of Ordinary of Chatham County, State of Georgia. He contended that this judgment was still in force and effect oai September 28th, 1933 (the date of the confession) ; that by reason of the aforesaid judgment the defendant was legally presumed to be insane, and that any statement or confession made by him was made by a person who was insane, and for that reason the statement or confession was not admissible.
 

 “At this time no attempt had been made by the defendant to identify himself as the same person who had been adjudged a lunatic in the State of Georgia in 1927. No identification having been made, I overruled the defendant’s objection and permitted the state to read the confession to the jury.”
 

 We think the court’s ruling is correct. Without a showing which would identify the defendant as being the same person who was adjudged a lunatic in the state of Georgia in 1927, the bill reserved is without merit.
 

 Bill No. 6.
 

 This bill was reserved to a ruling by. the court, maintaining an objection by the state to the admission of a documents offered-in evidence by the defendant. Thé¿ ruling' complained of is clearly shown to be correct by the court’s per curiam to the bill, from which we quote the following:
 

 “The State having rested its case in chief» the defendant through his counsel, and before he had offered any testimony at all, again offered in evidence the adjudication of lunacy dated February 9th, 1927, before the Court of Ordinary of- Chatham County, State of
 
 *560
 
 Georgia, adjudicating one Louis Kenneth Neu a lunatic. This offer was again objected to by the State,
 
 on
 
 the ground that the defendant had failed to identify himself as the same person named in the adjudication. » * * It was in thé power of the defendant to identify himself with the adjudication in the proceedings before, the jury. * * * I could not usurp the function of the jury to find upon due proof, ás a fact pertaining to his guilt or innocence, that defendant was one and the same person.”
 

 Bill No. 7.
 

 Counsel for defendant placed Dr. Joseph A. O’Hara,, a member of the lunacy commission appointed by the court in this case, on the witness stand, and asked him the following question:
 

 “From your investigation at Milledgeville, and from your conversation afterwards with the defendant, can you state, as a fact, that the defendant in this case is the same Louis Kenneth Neu who was in the institution?”
 

 The question was objected to upon the ground that whether the accused is the same man who was in the institution is a fact to be determined by the jury. The objection was maintained, and this bill was reserved to that ruling.' In the per curiam to the bill the judge says:
 

 ‘ “In addition to the reason given in this bill, I sustained the State’s objection to the question propounded to Dr. O’Hara for the reason that, in my opinion, the answer would, of necessity, have to be hearsay. Doctor O’Hara had testified that at the time he went to Millegeville State Insane Hospital for the State of Georgia, he had not yet seen defendant. This objection would apply with equal force to any statement made to Dr. O’Hara by the defendant and would, in addition thereto, be self-serving in nature.”
 

 We see no error in the ruling.
 

 Bill No. 8.
 

 During the course of the trial an aunt of defendant was called to the witness stand as a witness in his behalf. She identified the defendant as being the same Louis Kenneth Neu who had been committed to the Milledgeville Hospital for the Insane, at Milledgeville, Ga., under an adjudication of lunacy by the court of Chatham county, Ga., on February 9, 1927; whereupon, a certified copy of the adjudication was introduced in evidence without objection and was read'to the jury by defendant’s counsel, who also introduced in evidence and read to the jury a certified copy of the army record of the defendant. Counsel for defendant then placed a newspaper reporter on the witness stand, and Mr. Dowling, one of defendant’s counsel, addressed the court as follows:
 

 “Before this witness at this time testifies, counsel for defendant having introduced a judgment in court showing that fhis- defendant was declared a lunatic by a court of competent jurisdiction, and the judgment having been admitted in evidence, counsel now moves the court to exclude from the record herein and to instruct the jury to entirely disregard any statement or alleged confession which was made by this defendant, as testified to by the witnesses for the State in the trial of this case, and which said written statement has already been admitted in evidence.”
 

 
 *562
 
 Tlie court refused the motion, and this hill was reserved to that ruling. In the per curiam to the bill the judge says:
 

 “To have excluded defendant’s voluntary confession, * * *, for the reasons given by defendant, would have had the effect of holding that such an adjudication of lunacy was conclusive evidence of defendant’s incapacity to commit crime. The law does not so hold. Such an adjudication is at best nothing more than a specie of evidence to he considered by the jury as any other fact tending to prove the defendant’s want of capacity. * * * The burden of proving defendant’s incapacity to commit crime, and, consequently, his legal incapacity to confess the crime was upon the defendant. * * * I had already held that he was presently sane. In my opinion, at the time he requested the instruction, he had not borne his burden of overcoming the presumption of sanity. If I had granted the requested instruction at the time it was asked, my ruling would have had the effect of precluding the State from rebutting whatever legal effect the adjudication of lunacy might have been entitled to. Again, the rule generally adopted in regard to confessions made by persons said to be mentally deranged is that the admissibility of or the voluntary character of the confession is not affected thereby, but the circumstances are to be taken into consideration by the jury in weighing the evidence. It was for the jury to determine what weight they should give to the confession, in view of the alleged mental condition of the defendant.”
 

 The confession itself is the most eloquent refutation of defendant’s counsel’s attempt to have the courts of this state hold that defendant was a lunatic at the time he committed the murder for which he was convicted and at the time the confession was made. It impresses one with defendant’s mentality, an unusual memory for details, and an ability to recite them in proper sequence and in chronological order. We quote the confession in full:
 

 “I arrived in New Orleans the night of September 13th, 1933, at 8:30 at the L & N station. I carried my bags to the Monteleone Hotel and registered under the name of Joseph Monroe, Key West, Ela.
 

 “After having dinner and a bath,'I dressed and went to' the Club Plantation, where I spent the remainder of the night rendering a few songs at the floor show at Club Plantation. I returned to the Hotel at approximately 6:00 a. m. on the morning of September 14th. Half an hour later, I checked out, carried my bags to the corner of Dauphine and Canal Streets and I then caught a taxicab, to the DeSoto Hotel. I registered under the name of Bill Williams, Jacksonville, Fla., and was assigned Boom #916. I unpacked' my bags and went to bed. I got up around 2:30 in the afternoon and went down to Canal Street and saw a movie and purchased this weapon. The billy shown me by Superintendent Beyer is the weapon I refer to and I identify the same by the X mark placed on same by Detective McDermott of the Jersey. City police at the time of my arrest in Jersey City. The place where I purchased the billy for the sum of $1.25 is on Canal Street between the street on which the Monteleone is located and the L & N depot. The gentleman whose name I learned this morning to be Mr. Pailet, either sold me the billy or was in the
 
 *564
 
 pawnshop at the time that I purchased same. I walked back to the hotel to my room, and that was about 4:30. I should say about this time in the afternoon of the same day. I left the hotel around 10:00 p. m. that night and went back to the Olub Plantation where I stayed until 12:45 singing over the radio broadcast at the Olub Plantation and went back to the hotel for the night. That covers Thursday.
 

 “Friday morning at around 11:00 a. m. I walked into the Roosevelt Hotel Fountain Room and asked -for a Mrs. Eunice Hotte, and after meeting her, I made an engagement for the same afternoon * * * at 3:00 p. m. I took in another movie, then went back to the hotel. After dressing, I went back to the Roosevelt Hotel to keep my appointment with Mrs. Hotte. Due to some misunderstanding she did not meet me at the appointed place, and as I started out to her house on London Avenue, I fortunately boarded the same bus that she happened to be on at that time. This was 4:00 p. m. I went home with her and she had on the bus with her her little daughter, aged 5 and one of her relatives or girl friends. When we got off the bus, I asked her if it was necessary for her to take the child home and she said ‘No,’ that she could send the child home with this girl friend or relative, and we could go back to town on the next bus, which we did. Reaching Canal Street, we walked down to. Loew’s State and saw the show which was playing there at the time. I think the picture was ‘Beauty for Sale.’ We went back to the DeSoto Hotel where we had dinner and afterwards we went up to my room No. 916, and talked probably for an hour and a half. After conversing for an hour and a .half, 1 then escorted her home. Within two blocks of her home, we stopped at a little beer parlor and had several glasses of beer. Leaving the beer parlor, we walked about one block in the direction of her home, when she agreed to return to the hotel with me for the night, I left a call for 5:15 Saturday morning, as she had to be at work at the Hotel Roosevelt at 6:00 a. m. I spent the remainder of the day at the hotel, and at 5:00 p. m. left for the corner of Dauphine and Canal Streets to meet Mrs. Hotte as pre-arranged on Saturday morning. She had got ten off from work at 3 o’clock and went home to change clothes and make ready for her appointment.
 

 “At approximately 5:45, she arrived in the bus and we went to the Hotel DeSoto. We had dinner and retired to the room for the night. We also, left a call for 5:15 Sunday morning, as she had to go back to work.
 

 “Sunday morning at 5:15 we both arose and I escorted her back to the Roosevelt, where she went to work. I came back to my room and stayed there until 9:30. I dressed again and walked to the Jung Hotel on Canal Street through the lobby and then I sat down in the lobby. I arrived at the Jung Hotel about 10:00 a. m. An elderly gentleman sat down besides me in the lobby of the Jung Hotel directly in front of a Chevrolet truck. This elderly gentleman is the man whose name I later learned to be Sheffield Clark. After sitting about 5 or 10 minutes, this gentleman asked me what model that Chevrolet Truck was in front of us.- I told him I thought it was a 1933 model. The truck was there for a floral exhibit and had the name of John Doe, Florist, written on the side. The Flor
 
 *566
 
 ists’ convention was in town at the time. He made some remark about the radiator being different from the 1933 model. After that, we started a conversation in which we discussed politics, international affairs, conditions in foreign countries through which we both traveled, and we must have talked for an hour and a half, at which time he excused himself and said that he had to go to his room and write a few letters. As he left me he said, T am Mr. Sheffield Clark of Nashville.’ I told him I was Mr. Kenneth Neu from points east. During our conversation, I noticed his room number from the key tag, lying in his lap, which was #657. After he left, I stayed in the lobby for probably 10 minutes, then went back to the Hotel DeSoto and went to bed. At 3:30 I received a call from Mrs. Hotte and she told me she had just finished work and I invited her to come up, which she did. She stayed until about 6:00 p. m. and we made plans to leave New Orleans the next day between 1:00 and 2:00, she under the impression that I was financially able to take her away with me. After leaving me, she went home.
 

 “At approximately 8:30, while walking down Canal Street thinking of some way to obtain money to leave New Orleans immediately because of the fact that I was being looked for by the police of another city and having my baggage in the hotel, and being unable to get it out due to insufficient funds, I thought of the probability of Mr. Clark’s having a sum of money on him, which would enable me to' cover these debts and make my getaway. Remembering the room number, I walked through the Jung Hotel lobby and took an elevator to the sixth floor and walked to room '#657, knocking on the door and was immediately admitted to the room as though Mr. Clark was standing by the door when I knocked. I was admitted by Mr. Clark. There was no one else in the room. He invited me in and I sat down in a chair with my back to the window facing the bed. His clothing was hung on the other chair. He sat on the foot of the bed and after a few words of conversation, he invited me to have a drink of what he called ‘Tennessee Moonshine,’ which I later found to be imported whiskey. Before we had this drink, he rang down for ice and one of the bell boys brought the ice up. Then we had the drink. We talked a little and then had another drink and then I explained the nature of my visit. I told Mr. Clark I was in desperate circumstances and had to leave New Orleans immediately and that I needed money, and figured that he had it was the reason for my coming up to his room without an invitation. I threatened him and told him I would forcibly take it from if he refused to give it to me. He ordered me out of the room. As I turned to leave, he started to get up from the bed and telephone, presumably to call for assistance, and I turned and struck him over the head with the black-jack which I had concealed in my pocket, at the same time grasping him by the throat as he fell over the bed to prevent an outcry. After that, I do not know nor remember how many times I struck him. Then, the realization dawned upon me that I had probably killed him. I immediately made plans for a getaway, first arranging him in bed so that if anyone came in, they would think that he was sleeping. I took off his shoes, then went through his personal effects, taking $49.00 in cash out of his pocket and
 
 *568
 
 the keys to his car and a parking lot ticket which I found on the floor by the dresser at the foot of the bed. I then washed my hands and changed my outer shirt, putting on one of Mr. Clark’s, also one of his ties. The reason I washed my hands was because they were stained with blood. The shirt, collar and tie shown me at this time as well as the cuff buttons and collar buttons are the property of Mr. Clark taken by me from the grip as-well as the buttons taken from the dresser. The brown and white shoes shown me are the shoes that I took from Mr. Clark. I then removed my shoes, leaving them in the hotel room, wearing the shoes that I had removed from-the feet of Mr. Clark, probably because of changing my appearance. The shirt that I.had on was soaking wet from perspiration. I then left the room. I had been in the room approximately 45 minutes.
 

 “I left the room and walked down the staii'way. to the fourth floor, then took the elevator to the lobby. I walked out of the LaSalle Street entrance around to Canal Street and stopped at the parking lot next to the Jung Hotel on Canal Street and inquired for the car and was informed that the car was not parked at this particular lot, but was around at the Jung Hotel Courtesy Parking Lot and was directed how to get there. I walked around to this said lot. As I approached somewhat of a shelter on the parking lot, a colored boy whom I identify and whose name I learned to be Simms approached me with these words, ‘Yassah, what can I do for you?’ He showed me where the car was parked after I had explained to him what I wanted.
 

 “I had some difficulty in opening the door. He obliged me by finding the right key and unlocked it. He asked me what the old man had done about the pocket knives that were supposed to have been stolen out of the car. I told him that nothing had been done about it, that, the old man only wanted to get the knives back, or something similar. After getting in the car and turning on the ignition, I failed to find the starter due to it being my first experience with the new model Chevrolet. The boy told me how to start the car. I then asked him for directions to the Club Forest, and after giving me same, I drove the ear oft the lot and went out to Mrs. Eunice Hotte’s residence at 2644 London Avenue. I inquired for her and was told by her sister Grace that Eunice was not at home, having taken her little daughter to the Roosevelt Hotel to see some of her girl friend employees there. So I drove back towards the main part of town (Canal Street) with intentions of stopping at the hotel to locate Mrs. Hotte. While enroute down Rampart Street she passed me on a bus going out towards her home. I turned the car around and overtook the bus when it stopped for a traffic light and told her to get off. She did. Getting into my car, I drove her to her home and told her that I would be back within an hour to take her away — that I was leaving New Orleans that night. She asked me my reason for leaving so suddenly as we had planned to leave the following day. I told her T had read in the newspaper where they wanted me for assault in another city and had decided to get out of New Orleans immediately. I handed her an oil can which I had found back of Mr. Clark’s car and told her to give it to her sister as I had no need for it. I also dumped some property out- of the suit case which was in the back of the car and gave it to her as she was going in the house,
 
 *570
 
 at the same time telling her she could use it to pack some of her clothes in. The card-hoard, square, sample case and the leather sample case bearing a lock I identify as the two cases given her for the purpose of packing her clothes in. The oil can shown me at this time I identify as the oil can that I gave to Mrs. Hotte to give to her sister Grace. I told Mrs. Hotte to be ready as I would he back for her in an hour. ’ Then I drove back to the DeSoto Hotel, -and while enroute, I threw away various articles which remained in the rear of the car, stopping at garbage cans, alleys and one place as I went around the square on St. Bernard Street. I do not remember what I threw out, but I threw something out.
 

 “I drove within two blocks of the DeSoto Hotel and parked the car on St. Charles Street, then walked to the DeSoto and paid my room bill, went upstairs, changed clothes, called for a hoy to take my hags and came down to the lobby and talked to the Desk Clerk for probably 10 minutes. The gentleman who is brought before me and whose name I have been told is Joseph Harper is the night clerk with whom I spoke about 10 minutes before leaving and who checked me out of the hotel. The gentleman whose name I learned to be Joseph Schifano and who is now brought before me I identify as the bell boy who took my grips down from the room. The gentleman now before me whose name I have been told is Gordon Harmon is the clerk who checked me in the Hotel and I now identify him as such. After checking out of the Hotel, I picked up my bags and walked around to where I had parked the car on St. Charles Street and loaded the hags in the car and then drove to Mrs. Eunice Hotte’s residence where I picked her up and we immediately left New Orleans. This was 12 o’clock midnight.
 

 “I drove from New Orleans to Mobile, Pensacola, Jacksonville, Fla., Brunswick, Savannah, Ga., Charleston, S.- C., where I stopped for the night on the outskirts of the City at a tourist camp known as the Marion Camp Cottage #6.' The nest morning, before leaving the camp, I removed the license plates, No. 90967 Tennessee from the car and threw them under cottage #6, and in their place attached a ‘New Car in transit’ tág, with which I drove through Florence, S. C., Raleigh, N. C., and Richmond, Ya. I stopped at Richmond for the night at a tourist camp also on the outskirts of this city. The name of the camp I do not know. At the Marion camp I registered as K. Yan Heale, Memphis, Tennessee, and at the Richmond camp I registered as
 
 K.
 
 Van Heale, Shanghai, China. I left the camp at Richmond about 5:00 a. m., the following morning, Wednesday the 20th. I drove through Washington, D. G., Baltimore, Md., Philadelphia, Pa. As I left the. city limits of Philadelphia, I noticed a man standing alongside of the road in a sailor’s uniform. I stopped and asked him if he would like to ride into New York, to which he answered ‘Yes.’ He got in the car and we drove through Pennsylvania, Delaware, into the state of New Jersey and into the hands of the receivers, at Jersey City, the Jersey City police, which is what I call those three mugs who picked me up for a traffic violation. One of the arresting officers came up on my side of the car and asked me if I owned the car, to which 1 replied ‘no.’ He asked me whose car it was and
 
 *572
 
 I told him he knew whose car it was. He asked me where I had picked it up and I told him, ‘You know where I picked it up.’ He said he did not know exactly where, so I told him New Orleans. Then he asked me where was the gun and I told him I did not have a gun. He repeated the question and I told him again that I had no gun, so then he ordered the three of us out of the car, at which time the uniformed detective and other plain clothes men came up and separated us and started questioning us, with the exception of myself. After about fifteen minutes of conversation, we got into the police car and drove to the Station, where I was booked with being a Fugitive from Justice from New Orleans and carrying dangerous weapons in the nature of a black-jack, which they found in the suitcase in the car .after searching same when parked at the point of arrest. This is the same black-jack ‘billy’ with which I murdered Mr. Sheffield Clark at the Jung Hotel.
 

 “[Signed] Louis Kenneth Neu.”
 

 The entire defense is based on the theory that the defendant was adjudicated as a lunatic in Georgia in 1927, that he is to be forever thereafter presumed to be insane until that presumption is removed by a judgment of the court that decreed his insanity, regardless of the fact that he was decreed to be insane by reason of his relatives’ political influence, to save him from prosecution, and possible conviction, of a felony. As is well said in the brief of counsel for the state:
 

 “Did the fact that the defendant had proven himself to be one and the same person adjudicated an insane person in 1927 strike with nullity his confession made in September, 1933, six years later? His mental status in September, 1933, was at issue, not his mental status in 1927. The trial as to his guilt or innocence-was to be determined by his mental condition at the time of the commission of the homicide, and not his mental condition in 1927. * * * As heretofore discussed, insanity is an affirmative defense. The burden of proving the defendant’s insanity at the time of the alleged confession was upon defendant and defendant alone. Defendant not having offered any testimony as to his mental condition at the time of the making of the confession could not contend that because he had been adjudged insane over six years before, he was insane on the date of the confession.”
 

 We think the ruling complained of was correct.
 

 Bill No. 9.
 

 It is shown that the judgment of the court of Chatham county, Ga., adjudicating the defendant a lunatic, was rendered ill an ex parte proceeding had in 1927, at the instance of the father of the defendant, to save the defendant from a prosecution and possible conviction of a felony. The proceeding was summary, and, while Dr. E. McC. Connelly was testifying, the district attorney asked him the following question:
 

 “I ask you, doctor, as an alienist practicing since 1912, whether in your opinion anything that you have seen of Louis Kenneth'Neu, you and Dr. O’Hara — for a period of thirty-five days, or that you have gotten from his counsel, or from the court, — is there anything at all to indicate that any doctor could within
 
 *574
 
 a space of twenty-four hours from the time of their appointment come into court and say that this man was insane?”
 

 Counsel for the defendant objected to the question, the court overruled the objection, and this bill was reserved to that ruling. The judge’s per curiam to the bill disposes of it. The judge says:
 

 “I overruled defendant’s objection for the reason that, in m$r opinion, the answer sought was competent rebuttal. In order that defendant might excuse himself of the crime for which he was on trial, he offered in evidence, certified under Act of Congress, a petition before the Court of Ordinary, Chatham County, Georgia, dated February 9th, 1927, wherein the father of the. defendant asked that his son be adjudicated a lunatic. Annexed to this petition was an order appointing two doctors to examine the defendant. This order is dated February 8th, 1927. On February 9th, 1927, these two doctors reported that the defendant was a lunatic, and on the same date the Court found him to be such and ordered his commitment to a State Insane Asylum for treatment. The defendant told Dr. O’Hara that this was not a bona fide transaction, but his mother being influential in politics, and facing the penitentiary for a felony, he had just committed, she had arranged to have him committed to an insane asylum.
 

 “To have held that the adjudication was conclusive upon the state, and that the circumstances under which the adjudication was made were not open to inquiry, would have given the ex parte proceeding a legal effect which the law does not give it.”
 

 Bill No. 10.
 

 This bill was reserved under circumstances •identical with those mentioned in Bill No. & and for the same reasons given therein, we find the bill to be without merit.
 

 Bill No. 11.
 

 This bill was reserved to the refusal of the court to grant the following special charge:
 

 “I further charge you that a judgment of another State is conclusive; that is to say, it is conclusive and cannot be impeached except by setting up that the Court which rendered the judgment was without jurisdiction.”
 

 This was special charge No. 5. The court refused to grant it for the reason that the law was correctly charged in special charge No. 4, which was granted, and which was as follows:
 

 “I further charge you that the Constitution of the United States requires all states to give full faith and credit to the judgment of another state, and that, therefore, if you find from the evidence that there is a judgment of a foreign state admitted in evidence herein, that the judgment is entitled to full faith and credit.”
 

 We think the charge given to the jury correctly states the law and that special charge No. 5 was correctly refused.
 

 Bill No. 12.
 

 The assistant district attorney, in his argument to the jury, stated that:
 

 “It is the law, gentlemen of the jury, and the court will so instruct you, that lay witnesses have a right to testify to and express
 
 *576
 
 their opinion as to the sanity or insanity of a defendant on trial.”
 

 This remark was objected to by counsel for the accused. The objection was overruled, and this bill was reserved to that ruling. In the per curiam to the bill the judge correctly says:
 

 “Not only was it a correct statement of the law, but counsel had a legal right to draw whatever inferences or conclusions he saw fit from the evidence or lack of evidence. As a matter of fact, the defense did introduce the opinion of a lay witness as to defendant’s mental condition.”
 

 The witness referred to testified that during the five months that he was a shipmate of the defendant he noticed nothing peculiar about him “outside of being an ordinary every day man.”
 

 Bill No. 13.
 

 The judge in his charge to the jury says:
 

 “In a case of this kind, gentlemen of the jury, lay witnesses, persons who are not learned in matters appertaining to insanity, are, also, permitted to express their opinions if they are familiar with the conduct of the person pleading insanity. Such persons are competent in law, after' having stated the facts upon which they base their opinions, to state whether or not, in their opinion, the defendant is sane or insane. Of course, the same rules as to weight and credibility apply to lay witnesses who have expressed opinions as to the mental condition of the accused as to expert witnesses. You have the right to accept as true or reject as false or unreliable the opinion of any lay witness in accordance with the manner in which he may have impressed you.”
 

 The court in its per curiam says:
 

 “Defendant did not point out where my charge was erroneous. The evidence justified my giving this charge. It is a correct proposition of law.”
 

 In our opinion the charge of the court is in accord with the jurisprudence of this and, so far as we know, with that of our sister states.
 

 Bill No. 14.
 

 This bill was reserved to the refusal of the court to grant the defendant a new trial. The motion for a new trial presents no issue that is not presented in the thirteen bills which we have considered.
 

 For the foregoing reasons, the verdict and sentence appealed from are affirmed.